IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA

VS.

MARK UHLENBROCK

No. 5:21-CR-00084-XR

## MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT OF SUCH MOTION[1]

### INTRODUCTION

Supreme Court Justice Felix Frankfurter once remarked that "it is a fair summary of constitutional history that the landmarks of our liberties have often been forged in cases involving not very nice people."[2] This is a case that involves a lengthy history of upsetting conduct on the part of Mr. Uhlenbrock. Counsel does not dispute that and is not unsympathetic to the plight of the complaining witness in this case.

However, there are real, substantive limits of what the criminal law — and, specifically, *this* criminal law — can accomplish with respect to Mr. Uhlenbrock's actions. Those limits are set forth in the First and Fifth Amendment to the United

---

[1] All facts are not to be considered admissions but were gleaned from material made available by the either through its allegations or through its discovery materials. The facts are presented as if true so that this motion can be prosecuted. No such concession will be made if the case proceeds to trial.
[2] Civil Liberties and Civil Rights, USHistory.Org, available at https://www.ushistory.org/gov/10.asp (last accessed August 24, 2021).

States Constitution. For the reasons that follow, 18 USC § 2261A(2)(B) is unconstitutional both facially, and as applied to the particular facts of the case before the Court.

**FACTUAL BACKGROUND**

Beginning in 2002, Mr. Uhlenbrock and the complaining witness in this case, Y.Y., were involved in a romantic relationship. The pair had met through their work: Y.Y. was a flight attendant and Mr. Uhlenbrock was a pilot. During the course of this relationship — as is often the case in our modern times — Y.Y. sent to Mr. Uhlenbrock intimate photos, and Mr. Uhlenbrock took intimate photos of Y.Y..[3] At some point, Mr. Uhlenbrock began to upload some of these photos to the internet without Y.Y.'s consent or knowledge. She was alerted to his behavior by a colleague, and she subsequently broke things off with him in 2006.

While the relationship between the two ended, Mr. Uhlenbrock's behavior of posting nude images of Y.Y. to the internet did not stop. For several years he continued posting images of Y.Y. on the internet as well as writing accompanying stories from the perspective of Y.Y. She eventually filed a civil lawsuit against Mr. Uhlenbrock in Bexar County, Texas in 2009. The Court issued a consent judgment

---

[3] This was generally done with her permission, though there may have been at least one instance where he took a photo of her surreptitiously.

against Mr. Uhlenbrock in which he agreed to pay more than $100,000 in damages to Y.Y. and agreed to stop posting pictures of her online.

Mr. Uhlenbrock continued to post pictures of Y.Y. on the internet and was sued again by Y.Y. in 2009. Mr. Uhlenbrock paid damages and agreed to stop posting pictures of Y.Y. online once more. However, he continued to engage in this behavior, and was sued a third time in 2011. In the third lawsuit, Mr. Uhlenbrock and Y.Y. reached a settlement where he agreed to pay additional damages and agreed to stop posting pictures of Y.Y. online.

In 2015, the FBI began to investigate Mr. Uhlenbrock for posting pictures of Y.Y. online and discovered that in the summer of 2015, Mr. Uhlenbrock uploaded seven nude images of Y.Y. to the internet. The internet protocol address that was associated with those uploads was traced back to Mr. Uhlenbrock.

On August 26, 2015, a federal search warrant was executed at Mr. Uhlenbrock's residence, which resulted in the seizure of two laptops containing nude pictures of Y.Y. as well as links and bookmarks indicating that Mr. Uhlenbrock had used those computers to upload nude images of Y.Y. to the internet. Mr. Uhlenbrock cooperated with investigators and admitted to posting the pictures despite being the subject of the multiple civil injunctions and having paid out over $100,000 in damages. He noted that after posting the pictures, he would spend a lot of time tiny got remove the images from sites he posted them to by sending them notices under

the Digital Millennium Copyright Act. In the interview with law enforcement, Mr. Uhlenbrock described his behavior as an addiction — that he was excited by the prospect of posting and then removing the images of Y.Y.

Mr. Uhlenbrock was subsequently federally indicted,[4] alleging a violation of 18 USC § 2261A(2)(B) — the cyberstalking statute. The case was resolved by plea, and Mr. Uhlenbrock was sentenced to 41-months' incarceration and three years of supervised release on April 3rd, 2019. At sentencing, Mr. Uhlenbrock addressed Y.Y., noting that "I owe you an apology. I am sorry. It is not enough. I feel that I owe you your life back. I wish I could go back and help you with that. I think about you and what I have done every waking hour of every day. I more than embarrassed you. I humiliated you. I caused you to be fearful. I have affected your social life. I affected your motivation to go to work. I would like you to know that even though what I did was very mean and for a long time, I did it without malicious intent. I didn't do it to be mean. I didn't do it to be vengeful for revengeful. It is the terrible nature of my addiction. I have nothing against you. I think you are a very nice woman. I like you."[5]

Subsequent to his custodial term, Mr. Uhlenbrock violated his supervised release by viewing sexually explicit material, having contact with a minor without

---

[4] *United States v. Uhlenbrock*, 5:16-cr-00389-XR.
[5] Transcript, Case No. 16-cr-00389, DE # 38 at 3-4.

4

prior approval, and by failing to answer truthfully about his possession of an internet-enabled computer without prior approval.[6] During the sentencing hearing, the government agreed that what was going to get Mr. Uhlenbrock to stop was not going to be more jail time, but treatment.[7] The Court revoked his supervised release for six months, and reimposed a new three year supervised release term.[8]

After Mr. Uhlenbrock was released from prison, Y.Y. undertook an investigation into whether or not Mr. Uhlenbrock had resumed his posting activities. In the summer of 2020, she discovered that he had resumed making posts and then deleting them. She contacted the FBI with printouts of what she had discovered, noting that "[w]e know that his M.O. is to post this stuff and then delete. This is part of the excitement/fear that he enjoys. Unfortunately for him, I was able to find this stuff before he could find it all and delete it in time." Y.Y. also told law enforcement that Mr. Uhlenbrock's posts were using her old name.

Specifically, Y.Y. discovered that accounts she knew or believed to be associated with Mr. Uhlenbrock were posting nude images of her to Reddit.com, Imgur.com, and elsewhere using various accounts. Y.Y. also discovered several stories that were posted which were written from the first-person perspective — giving the appearance to an outside observer that it was in fact Y.Y. who was posting

---

[6] Id., De #54, 2. He was not posting pictures of Y.Y. at this point but stated at the revocation hearing that he was attempting to ensure that he had been successful in taking the prior posts down.
[7] Id.
[8] Id.

the images and writing the associated stories.[9] In the discovery that has been provided to the undersigned, the vast majority of these posts do not identify Y.Y. textually — that is, while the posts do use images of Y.Y., the information posted alongside the images does not appear to identify her (with the exception of one post, where Y.Y.'s name is on the image itself). Some of the stories do reference Y.Y.'s first name in the content.

Many of the posts that Y.Y. had discovered had already been deleted or removed by the time that she sought them out, but of course several had not. Y.Y. provided all of this information to the FBI, who in turn served a subpoena on the internet service provider associated with the IP address that made the postings. The information that law enforcement received was that Mr. Uhlenbrock was the subscriber associated with that IP address.

On December 7th, 2020, an arrest warrant was issued for Mr. Uhlenbrock, which was served the following day. He was subsequently federally indicted in the above-captioned Indictment, and the instant Motion follows.

**ARGUMENT**

18 USC § 2261A(2)(B) criminalizes a course of conduct undertaken by someone with the intent to kill, injury, harass, or intimidate that causes, attempts to

---

[9] Counsel does not want to include the verbatim names of the stories in the instant motion for privacy considerations, but generally speaking the titles and content of the stories lead readers to believe that the author a flight attendant in Y.Y.'s state of residence who is an avid exhibitionist and swinger.

cause, or would be reasonably expected to cause substantial emotional distress to an individual. It is colloquially known as the cyberstalking statute, and has been repeatedly amended, and neither the 5th Circuit Court of Appeals nor the United States Supreme Court has heard challenges to the statute that are raised here.[10]

This provision is both facially unconstitutional, as well as unconstitutional as applied to the facts of this case. The provision is facially unconstitutional under the Fifth Amendment because it is facially vague and violates the Due Process Clause. The provision is also unconstitutional as applied as it violates Mr. Uhlenbrock's rights under the First Amendment.

**1. Vagueness**

What is emotional distress, and how much emotional distress is substantial emotional distress? 2261A(2)(B), on its face, violates the Due Process clause of the Fifth Amendment because it affixes criminal liability to the answers to these questions which vary from person to person. Criminal laws must be drafted such that ordinary people would be given proper notice of what conduct is punished and that would not simply invite arbitrary enforcement. *Kolender v. Lawson*, 461 U.S. 352 (1983); *Grayned v. City of Rockford,* 408 U.S. 104 (1972).

---

[10] The 5th Circuit Court of Appeals did hear a vagueness challenge to 2261A in *United States v. Conlan*, 786 F.3d 380 (5th Cir. 2015) and rejected it, but that vagueness challenge differs from the instant motion as developed below. Furthermore, *Conlan* construed a prior iteration of the statute and was decided prior to relevant Supreme Court precedent as set forth below.

Here, the statute criminalizes conduct that "would reasonably be expected to cause substantial emotional distress." Nowhere in the statute is "substantial emotional distress" defined — indeed, emotional distress, much less substantial emotional distress, is an inherently subjective concept.

A recent decision from the United States Supreme Court is instructive on this point: in *Johnson v. United States*, 576 U.S. 591 (2015) the Court struck down the residual clause of the Armed Career Criminal Act which imposed enhanced punishment if the defendant had three or more prior convictions for a "violent felony." *Id.* The term violent felony was defined in the code as any felony that "involves conduct that presents a serious potential risk of physical injury to another." *Id.* The Court struck down the residual clause as unconstitutionally vague, finding that there were two aspects of the law that required them to strike it down: that the provision required judges to "imagine how the idealized ordinary case of the crime" would play out when assessing potential risk, and to assess "how much risk it takes for a crime to qualify as a violent felony." *Id.* The Court noted that the combination of "indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.*

The application to the facts at hand is relatively straight-forward: nowhere in the statute is substantial emotional distress defined. As with *Johnson*, the finding of criminal liability turns on a subjective assessment of two inquiries: (1) what conduct be reasonably expected to cause substantial emotional distress *and* (2) when does emotional distress become substantial? These are inquiries that are tied to people's subjective experiences and requires the exact same judicial imagining that the Court condemned in *Johnson*. *Cf. Sessions v. Dimaya,* 138 S.Ct. 1204 (2018) (holding that a clause of the Immigration and Nationality Act that defined crime of violence as "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" was unconstitutionally vague).

While the Fifth Circuit did reject a vagueness challenge to the statute, it does not preclude the current challenge. In *United States v. Conlan*, 786 F.3d 380 (5th Cir. 2015), the 5th Circuit Court of Appeals rejected a vagueness challenge to the 2006 version of 2261A on plain error review, where the appellant alleged that the statute was unconstitutionally vague because "neither 'harass' nor 'intimidate' "was defined. *Id.* That is not the challenge Mr. Uhlenbrock makes today. In *Conlan*, it was clear that the 5th Circuit focused its analysis on 2261A(2)(A) ("To violate the statute one must both intend to cause a reasonable fear of death or serious bodily injury and in fact cause a reasonable fear of death or serious bodily injury.") *Id.* at 386. To be

9

sure, those are elements of an offense under 2261A(2)(A), but not the section of the statute under which Mr. Uhlenbrock is presently indicted. Indeed, as set forth herein, "in fact caus[ing]" any harm is not a requirement for criminal liability under (2)(B) — rather only that speech which would reasonably be expected to cause substantial emotional distress. *Conlan* also construed the 2006 version of the statute, which is not at issue here. Finally, *Conlan* was decided approximately one month before the Supreme Court rendered its decision in *Johnson*, which struck down a closely analogous statute. Stated differently, the Court has not had the opportunity to evaluate the challenge raised herein to the clause of the statute related to substantial emotional distress, nor has it had the opportunity to apply the holdings of *Johnson* and *Dimaya*.

**2. First Amendment**

The First Amendment to the United States Constitution provides that "Congress shall make no law … abridging the freedom of speech." U.S. Const. AM I. Even speech that is difficult, upsetting, or challenges sensibilities is entitled to First Amendment protection. *United States v. Stevens*, 559 U.S. 460 (2010). Of course, not all speech is protected, and the Supreme Court has delineated some exceptions to the general rule of protection afforded to speech in the cases of obscenity, defamation, fraud, incitement, true threats, and speech integral to criminal conduct. *United States v. Cook*, 472 F.Supp.3d 326 (N.D. Miss. 2020). However, the

Supreme Court has observed that it is a basic principle of the freedom of speech that it "remains protected even when it may 'stir people to action,' 'move them to tears,' or 'inflict great pain." *Sorrell v. IMS Health, Inc.,* 564 U.S. 552, 576 (2011). While the statute regulates conduct, conduct can also be protected by the First Amendment if it is significantly imbued with elements of communication." *Texas v. Johnson,* 491 U.S. 397 (1989).

A law is content based if it concerns itself with "the undesirable effects that arise from the 'direct impact of speech on its audience'." *McCullen v. Coakley,* 134 S.Ct. 2518 (2014), *Reed v. Gilbert*, 135 S.Ct. 2218 (2015). As applied to the facts of this case, the cyberstalking statute functions as a content-based restriction on speech and as such is presumptively invalid with the burden falling to the government to rebut that burden. *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000). As the Supreme Court noted in *United States v. Stevens*, 559 U.S. 460 (2010), the established exceptions to the First Amendment are rooted in "long-settled tradition of subjecting that speech to regulation." *Id.*

Simply stated, the act of Mr. Uhlenbrock posting Y.Y.'s images and writing lurid stories on the internet is not criminal under 2261A(2)(B). As-applied, the law functions as a content-based restriction because whether it is criminal turns on whether the content would cause substantial emotional distress. As such, the restriction must be "necessary to serve a compelling state interest." *First National*

*Bank of Boston v. Belloitti*, 435 U.S. 765 (1978). And here, "the Government's interest in criminalizing speech that inflicts emotional distress is not a compelling one." *United States v. Cassidy*, 816 F.Supp.2d 574 (D. Md. 2011).

In *United States v. Ackrell,* 907 F.3d 67 (1st Cir. 2018) the 1st Circuit rejected a facial First Amendment challenge to the cyberstalking statute. In so doing, however, the *Ackrell* Court expressly acknowledged that the statute "could have an unconstitutional application and remaining cognizant of the chilling-effect-related concerns…[s]hould situations arise where the statute is applied to courses of conduct **that are sufficiently expressive to implicate the First Amendment, we are confident that as applied challenges will properly safeguard the rights that the First Amendment enshrines.**" *Id. a*t 77 (emphasis added).

*A*s the quoted language from *Ackrell* foreshadowed, another court in this Circuit dismissed an indictment under the statute that as being applied to "courses of conduct that [were] sufficiently expressive to implicate the First Amendment[.]" *Id.* In *United States v. Cook*, 472 F.Supp.3d. 326 (N.D. Miss. 2020), the defendant was acquitted of state charges of the sale of a controlled substance in a case that was widely publicized. Subsequent to his acquittal, he availed himself of the modern town square — Facebook — to voice his grievances. Following a series of posts that authorities construed as threats, including posts appearing to identify the personal residence of one of the police officers that was involved in his prosecution, he was

federally indicted under the cyberstalking statute. *Id.* The court ultimately found that, as applied, the statute was unconstitutional. *Id.*

In dismissing the indictment, the court in *Cook* specifically noted that relatively few of the cases construing the limits of the cyberstalking statute dealt with what it referred to as a "bulletin board" post. *Id.* at 335. In other words, the threats in *Cook* were never sent to any of the erstwhile victims of those threats — they were simply posted to his personal Facebook page. People had to seek them out of their own accord and read them: "the government has not alleged that Cook ever directly contacted any of the subjects of his Facebook posts. Rather, Cook is being prosecuted solely on the content of his public posts — not the act of posting." *Id.* at 332.

Similarly, in *United States v. Cassidy*, 814 F.Supp.2d 574 (D. Md. 2011) dismissed an indictment under the cyberstalking statute for the defendant's use of Twitter and various blogs to variously threaten the complaining witness and tell them to kill themselves. *Id.* In dismissing the indictment, *Cassidy* cited to *Playboy Entertainment Group,* 529 U.S. at 813 for the proposition that

> Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities simply by averting [our] eyes.

*Id.* At 585. The *Cassidy* court noted that the complaining witness "had the ability to protect 'her own sensibilities simply by averting' her eyes from the Defendant's blog and not looking at or blocking his Tweets." *Id.*

As in *Cook* and *Cassidy*, Mr. Uhlenbrock did not send any of the speech at hand to Y.Y. — rather, he is "being prosecuted for the content of his public posts." *Cook*, 472 Supp.3d. 326 at 334. He made these posts on platforms similar to those at issue in *Cook* and *Cassidy*. Indeed, in the discovery material provided to counsel, it does not appear that Y.Y. would have discovered the material had she not undertaken her own investigation: none of the stories or images were sent to her by Mr. Uhlenbrock, the photos that he posted are nearly two decades old now and to the extent that he did use her name, it was an old one. Furthermore, and unlike the defendant in *Cassidy (*and arguably *Cook)*, his intention in writing the stories and posting the photos was not to upset Y.Y., as set forth in the factual background above. Indeed, as has been his custom, he attempted to take down the posts once they were online and, in many cases, succeeded in doing so.

In short, as applied, the statute criminalizes speech that is upsetting — and understandably so — to Y.Y. That is the only element of the crime at issue here. Were it not for her searching out these posts, it seems unlikely that she would have ever encountered them. And counsel does not mean to minimize the fact that they are upsetting. However, one's personal upset or lack thereof is not a sufficient

14

justification under the First Amendment and authorities cited herein for the government to criminalize speech. This is not to say that Y.Y. is without remedy, but only that it is not a remedy to be found in prosecuting Uhlenbrock under this statute.

## Conclusion

For the foregoing reasons, the Court should dismiss the above-captioned indictment us facially unconstitutional under the Fifth Amendment and unconstitutional as-applied under the First Amendment.

Respectfully submitted,

THE LOCKE LAW GROUP, P.L.L.C.
523 E. Quincy Street
San Antonio, Texas 78215
Ph: 210-229-8300
Fax: 210-2298301

By: <u>Shannon W. Locke //S//</u>
SHANNON W. LOCKE
shannon@thelockelawgroup.com

## CERTIFICATE OF SERVICE

      I certify a true and exact copy of the Defendant MARK UHLENBROCK's Motion to Dismiss was served to the U.S. Attorney's office on November 18, 2021, via electronic filing.

                                           <u>Shannon W. Locke //S//</u>
                                           Shannon W. Locke